UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| BETSY ACKERSON, | |
| Plaintiff, | |
| v. | |
| THE RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA, | Case No.: _____ |
| Serve: | |
| William H. Goodwin, Jr. Rector 800 E. Canal Street Suite 1900 Richmond, Virginia 23219, | |
| Defendants. | |

## CIVIL COMPLAINT FOR MONETARY AND EQUITABLE RELIEF

Plaintiff Betsy Ackerson ("Ackerson" or "Plaintiff"), by and through undersigned

counsel, files this suit against the Rector and Visitors of the University of Virginia ("UVA") for

violations of The Equal Pay Act of 1963, Title IX of the Education Amendments of 1972, Title

VII of the Civil Rights Act of 1964, and The Rehabilitation Act of 1973.

### Introduction

1.      UVA violated the Equal Pay Act when it subjected Ackerson to unequal pay for

comparable work performed by male colleagues.

2.      UVA violated the Equal Pay Act when it retaliated against Ackerson for

complaining about her unequal pay and seeking to have her complaints redressed.

3.      UVA violated Title IX of the Education Amendments when it paid Ackerson less

1

than male colleagues who perform comparable work based on her sex.

4.      UVA violated Title VII of the Civil Rights Act of 1964 when it subjected

Ackerson to disparate treatment, including unequal pay for the work she performed, based on her

sex.

5.      UVA violated the Rehabilitation Act when it retaliated against Ackerson for

informing UVA of her medical conditions, her need for medical leave and accommodations, and

her use of leave.

## Jurisdiction and Venue

6.      This Court has jurisdiction over the subject matter of this jurisdiction pursuant to

28 U.S.C. § 1331, because the action arises under the laws of the United States of America,

namely the Equal Pay Act, Title IX, Title VII, and the Rehabilitation Act.

7.      Ackerson has exhausted the administrative remedies available to her under Title

VII of the Civil Rights Act of 1964 with the Equal Employment Opportunity Commission and

the United States Department of Justice Civil Rights Division.

8.      The United States Department of Justice Civil Rights Division issued Ackerson a

Notice of Right to Sue on January 12, 2017.

9.      This Court has personal jurisdiction over UVA because it has substantial and

deliberate contacts with the Commonwealth of Virginia, and it conducts business in the

Commonwealth of Virginia.

10.      Venue in this district and division is appropriate pursuant to 28 U.S.C. § 1391

because UVA has significant and deliberate contacts with this district and division.

11.      Venue in this district and division is also appropriate pursuant to 28 U.S.C. §

1391 because it is the district and division where the substantial majority of the events giving rise

2

to these claims occurred.

## Facts

**A. Dr. Betsy Ackerson Has Significant Experience Working in the Field of Higher Education.**

12.     Dr. Betsy Ackerson, Ph.D., is a 44 year old woman and is a resident of Charlottesville, Virginia.

13.     Ackerson earned a Ph.D. in Higher Education Administration from the University of Virginia in 2009.

14.     Ackerson has significant experience working in the field of higher education.

15.     In December 2012, Ackerson accepted the position of Project Manager for Strategic Planning in the Office of the Executive Vice President and Provost at UVA and worked as a de facto staff member of the Office of the President.

16.     While she was a doctoral student at UVA, Ackerson worked as an Academic Affairs Associate in the Office of the Executive Vice President and Provost at UVA.

17.     From 2009-2012, Ackerson served as a Co-Principal of a Catholic higher education start-up in the Republic of Ireland.

18.     Ackerson served as the Editor of *Higher Education Quarterly* at the Center for the Study of Higher Education from 2004 to 2005.

19.     From 2002 to 2004, Ackerson worked at The College of William and Mary's Mason School of Business in Williamsburg, Virginia as a Manager of its Office of Public Relations and Communications.

20.     Ackerson also served at William and Mary as the Senior Corporate Gifts Officer.

21.     While at William and Mary, Ackerson served as Editor of the *School of Business Magazine.*

3

22.     And from 1995 to 1996, Ackerson served as an Admissions Counselor at Sweet Briar College in Sweet Briar, Virginia.

**B. Ackerson Began Working at UVA in the Position of Project Manager for Strategic Planning in Late 2012.**

23.     In August 2012, Ackerson placed a phone call to Nancy Rivers ("Rivers"), Chief of Staff for the President, with whom she had previously worked at UVA.

24.     Rivers told Ackerson she believed there were two high presidential priority projects at UVA which might be of interest to Ackerson: one involving the UVA strategic plan and the other involving financial planning.

25.     Ackerson was qualified for both jobs because she holds a Ph.D. in higher education and a Master's of Business Administration.

26.     Ackerson told Rivers she would be interested in either position, and Rivers recommended Ackerson pursue the strategic plan position because that project was of higher priority for UVA.

27.     UVA finally posted the job on November 7, 2012, and Ackerson applied on November 8, 2012.

28.     Ackerson accepted the position of Project Manager for Strategic Planning with UVA in December 2012, which she held until May 2016 when UVA changed her position and duties.

29.     The position was originally a one year appointment at a salary of $70,000 per year.

30.     However, Rivers told Ackerson that a substantial amount of work and value would be generated from the strategic plan work, which would position Ackerson for a permanent job at UVA.

4

**C. Ackerson Worked Under the Supervision of James Milton Adams in Her Position at UVA Until Adams' Retirement in May 2016, and She Frequently Had to Perform Much of Adams' Work for Him.**

31.    From the time Ackerson accepted the job in December 2012, Ackerson's supervisor has been James Milton Adams ("Adams") until Adams retired in May 2016.

32.    Ackerson and Adams previously worked together when Ackerson worked at UVA during her doctoral program.

33.    Shortly before Ackerson began working at UVA in 2012, UVA transitioned Adams from Vice Provost of Academic Affairs to Senior Vice Provost.

34.    Regarding the Strategic Planning Project, Adams reported to both the Provost and the University President.  Thus, Ackerson effectively reported to the Provost and President of the University regarding strategic planning.

35.    As early as spring 2013, Ackerson noticed that Adams did not carry his share of the workload on the Strategic Planning Project.

36.    In fact, Ackerson regularly, routinely, and frequently received questions from former Provost John Simon ("Simon") to the effect of:  "What does Milton Adams do?"

37.    On one occasion, in about July 2014, UVA President Teresa Sullivan ("Sullivan") made a statement to Ackerson to the effect of "I think we all know that Milton relies on you to get all the work done."

38.    Despite the fact that Ackerson had to perform many of the duties assigned to Adams, Adams earned a salary of between $200,000 and $250,000.

39.    In or about March 2013, Adams told Ackerson that she needed to find a new job.

40.    Yet prior to this statement, Ackerson had received nothing but positive feedback from Adams on her performance.

5

41.     When Ackerson asked for an explanation, Adams told her that his statement was based simply on her position being temporary.

**D.  In 2013, Adams Hired Charlie Feigenoff to Work on the Strategic Plan. UVA Paid Feigenoff to Perform Many Duties That Ackerson Already had Within Her Purview and Paid Feigenoff at a Higher Rate Than Ackerson.**

42.     Yet only about two weeks later, Adams announced that he planned to hire a writer to carry out the writing of the Strategic Plan.

43.     Adams proposed this idea during a meeting between Ackerson, Rivers, President Sullivan, and himself.

44.     Ackerson did not oppose the idea during the meeting, although she did later remind Adams in private that such duties fell within her purview and were actually the duties that the University had hired her to perform.

45.     Adams subsequently hired his friend, Charlie Feigenoff, to write the strategic plan, at a rate of about $125.00 per hour.

46.     Feigenoff is a male in his sixties, and he is a personal friend of Adams.

47.     This initial proposal was to cost about $25,000.

48.     By contrast, Ackerson continued to earn $70,000 per year, which equates to an hourly rate of $35.00 per hour.

49.     Feigenoff quickly exceeded the $25,000 initial proposal.

50.     Yet during this time, Ackerson frequently had to brief Feigenoff on the strategic plan, despite the fact that UVA paid him significantly more than it paid her.

51.     Justin Thompson, a male who previously held a very similar position to Ackerson's, had the title of Associate Provost when he held the position, and the University paid him at least $100,000 per year.

**E. In Summer 2013, UVA Expanded the Scope of Ackerson's Duties, and Ackerson First Complained About Her Unequal Pay.**

52.     In summer 2013, UVA widened the scope of Ackerson's job responsibilities to include financial forecasting beyond her work on the strategic plan development process.

53.     At about the same time, UVA assigned former Associate Vice President for Budget and Financial Planning, Mark Hampton (male), to financial forecasting duties.

54.     Ackerson and Hampton did equal work on these duties, but UVA paid Hampton a salary of at least $185,000.

55.     After Hampton left UVA in 2014, Ackerson continued to do the work by herself.

56.     Around that time, Ackerson met separately with Rivers and Adams about a potential increase in her salary, yet her salary remained the same.

57.     Ackerson also told Simon around the same time that there was an issue of inequity regarding her salary.

58.     Ackerson learned a short time later that Rivers, Adams, Simon, and President Sullivan met in May 2013.

59.     At that meeting, Adams told the group that he had suggested to Ackerson that she look for a new job.

60.     Simon became upset by this news and actually met with Ackerson later, told Ackerson that he wanted her to work directly for him, and he even asked Ackerson to put together a job description for a new position working under him.

61.     However, subsequent discussions about a new positon for Ackerson went nowhere.

**F. Ackerson Complained to UVA Again in November 2013 About Her Unequal Pay.**

62.     In November 2013, Ackerson met again with Adams and Rivers to discuss her position, the upcoming end of her contract, and her concerns about the low salary UVA paid her.

63.     Rivers and Adams agreed that UVA had paid Ackerson too little money for the work she performed for UVA.

64.     In fact, Rivers asked Ackerson for a new salary range.  Ackerson suggested a range of $120,000 - $150,000.

65.     Rivers agreed that Ackerson's proposed salary range was reasonable, given the amount and level of work she performed.

66.     At that time, Rivers said UVA would commit to renew the contract for another year at a higher salary if Adams agreed.

67.     UVA later extended Ackerson's one-year contract, however the extension did not come with a higher salary as promised.

68.     Ackerson also never signed a new agreement with UVA in 2013.

**G.   In Late 2013, Ackerson Began to Suffer Severe Exhaustion. This Severe Exhaustion Eventually Led to a Diagnosis of Chronic Fatigue Syndrome, Which Caused Ackerson to Take Medical Leave.**

69.     In about December 2013, Ackerson began to suffer from severe exhaustion, to the point that she nearly collapsed at work.

70.     Ackerson eventually received a diagnosis of chronic fatigue syndrome in or about late March 2014.

71.     As a result of the health issues she suffered, Ackerson had to take medical leave.

72.     Following treatments, Ackerson slowly returned to work on a limited basis for about two hours per day in June 2014.

73.     Gradually, over the next six (6) weeks, Ackerson increased her workload by about

8

two hours per day every other week until she returned fully to a normal work schedule.

**H. While Ackerson Was Out of the Office for Medical Leave, UVA Stripped Ackerson of Her Private Office and Personal Printer.**

74. But Ackerson only found more stress and problems upon her return to her job at UVA.

75. Ackerson discovered that little to no work had been performed on the Strategic Plan while she had been out of the office.

76. In particular, there was considerable work needed on implementation of the plan, including all communication efforts, which had not been carried out in Ackerson's absence.

77. Ackerson also returned to UVA to find herself without a private office.

78. In an email exchange that Ackerson had with Rivers during Ackerson's medical leave in March 2014, Rivers told Ackerson that UVA had assigned a new employee temporarily to sit in Ackerson's office, but Rivers assured Ackerson that her office would be restored to her upon her return from medical leave.

79. Yet, while Ackerson was out on medical leave, UVA assigned her former office to David Wolcott (male), the Associate Vice Provost for Academic Accreditation.

80. UVA promised Ackerson that she would be reassigned to an private office, yet she remains to this day assigned to a cubicle in an open area.

81. This lack of a private office also places extra burdens on Ackerson in carrying out her duties since she often needs to have confidential communications regarding UVA's strategic plans.

82. Due to her job duties, Ackerson often needs to participate in phone conversations that involve sensitive information, which makes her assignment to a cubicle in an open area totally inappropriate and physically taxing on Ackerson.

9

83.     Additionally, Ackerson frequently has to meet with others in person as part of her duties.

84.     Now, in order to conduct these meetings, Ackerson has to find available conference rooms.

85.     In this time period UVA also removed Ackerson's access to a personal printer, which required her to walk long distances to retrieve printed documents, thereby aggravating her medical condition.

## I. Ackerson Once Again Complained of Her Unequal Pay in 2014, Following UVA's Institution of a New Salary Classification Structure.

86.     In July 2014, UVA adopted a new salary classification structure.

87.     Thus, in the fall of 2014, well after Ackerson's return from medical leave, Ackerson once again had separate discussions with Rivers and Adams to discuss her low salary.

88.     On or about October 9, 2014, Ackerson sent a memorandum to Rivers and Adams which described her previous conversations with them about her pay rate, as well as their previous agreements that her salary level was inappropriate.

89.     Rivers and Adams told Ackerson that because she challenged her classification, the University would require her to undergo a review process.

## J. When Ackerson Wrote a New Job Description as Part of an HR Review Process, Adams Refused to Fully Cooperate in the Process.

90.     Ackerson participated in this process, which is not formal and is not governed by any UVA policy.

91.     UVA Human Resources instructed Ackerson to write a job description which "captured everything" about her position in order to prove that the University had misclassified her.

10

92.     After Ackerson completed the description, she had to submit it to Adams for approval, pursuant to an informal and undocumented process in place at UVA.

93.     After she received Adams' approval, Ackerson sent the job description to HR in or about November 2014.

94.     In December 2014, UVA once again extended Ackerson's contract by one year.

95.     This contract extension from UVA came only two days before Ackerson's contract would have otherwise expired.

96.     Like it had done in 2013, UVA kept Ackerson's salary at the same level, and Ackerson did not sign a new agreement.

97.     Also in late 2014 and early 2015, Ackerson engaged in unrelated meetings with Adams with the goal of negotiating a new three-year contract with UVA.

98.     As part of these meetings and negotiations, Adams purportedly worked on developing a new job description for Ackerson.

99.     During the negotiations, Adams informed Ackerson that President Sullivan had approved the new three-year contract in January 2015, but Simon had not supported it.

100.    As well, HR learned during its investigation of Ackerson's misclassification review that Ackerson and Adams were in discussions about a new job description and contract.

101.    HR decided, during the process, that the new contract and Ackerson's previous complaints, which were separate but had happened in close proximity, were related.

102.    HR told Ackerson during the review process that it was ultimately Adams who needed to decide what the appropriate job description for Ackerson was in order for the review process to proceed.

103.    Adams never acted on this decision.

**K. When Ackerson Stated that She Would Raise Concerns About Her Unequal Pay Outside of Her Reporting Structure, Adams Threatened Her Employment.**

104.    Ackerson later asked Adams about his role in the decision making process for her job descriptions, and Adams denied knowing that the decision was his responsibility.

105.    Adams also blamed Simon for failing to discuss Ackerson's proposed new contract with President Sullivan.

106.    Ackerson became frustrated by these repeated delays, and she told Adams during one meeting in February 2015 that it was her intention to ask for a meeting between Sullivan, Simon, and Adams to resolve the issue of Ackerson's unequal pay.

107.    Adams told Ackerson that she risked losing her job if she mentioned the issue of unequal pay or the new three-year contract to anyone, including Simon and President Sullivan.

108.    Adams' tone during the meeting when he made the comment was different than the tone he usually used with Ackerson, and Ackerson took his statement as a threat.

109.    Adams also failed to present Ackerson with the new contract, which President Sullivan had approved.

**L. In February 2015, Adams Issued Ackerson a Performance Review that Rated Her "Highly Effective" Rather Than "Exceptional," and Adams Could Not Provide Justification for the Evaluation When Ackerson Asked Him to do so.**

110.    After raising her concerns of unequal pay, on or about February 26, 2015, Adams issued Ackerson a performance evaluation with a lower rating of "highly effective" as compared to the highest possible rating of "exceptional."

111.    On or about April 14, 2015, Ackerson met with Adams to discuss her performance evaluation and seek Adams' advice on how she might improve her performance.

112.    During this meeting on April 14, 2015, Adams could provide no legitimate basis for providing Ackerson with a rating of "highly effective" as compared to "exceptional."

12

113.    Adams told Ackerson during this meeting that her work was "A+," but that if he gave her the highest possible rating, then it would mean her goals were set too low and would leave her no room to improve. Adams also told Ackerson that he never gave the highest rating to anyone.

114.    When Ackerson requested during the meeting that Adams provide her with input as to how she might improve her performance, Adams was unable to offer any concrete suggestions.

115.    And only a year earlier, in Ackerson's annual review for 2013, Adams had indeed issued Ackerson a rating of "exceptional," despite his contention in 2015 that he never issued such ratings.

**M. In June 2015, UVA Once Again Refused to Restore Ackerson's Private Office.**

116.    On June 29, 2015, Ackerson met with Linda Birckhead ("Birckhead"), within the President's office at UVA, to discuss the possibility of UVA reassigning Ackerson to a personal office.

117.    At the time of this meeting, roughly 50 percent of the offices in the building in which Ackerson sought to be reassigned an office, Madison Hall, were vacant.

118.    Birckhead spoke to Rivers about the possibility of reassigning Ackerson a private office in Madison Hall.

119.    Birckhead then informed Ackerson that UVA would not reassign her to a private office.

**N. After Ackerson complained more formally and with the assistance of counsel about unequal pay, UVA increased Ackerson's salary twice in 2016 and assigned her to a role with increased duties in March 2016, yet UVA still did not take steps to increase her pay to the appropriate level of pay or title.**

120.    Beginning in October 2015, Ackerson formally complained about her unequal

13

pay, through counsel, by initiating contact with the General Counsel's office of UVA.

121.    Ackerson has continued to engage UVA formally through counsel since that time and has made demands for equal pay.

122.    In March 2016, UVA named Ackerson as Assistant Vice Provost, gave her a new job description, and increased her salary to $95,000.

123.    The new job description encompassed many duties that Ackerson had already been performing.

124.    UVA did not consult with Ackerson before assigning her to this new position, nor did it hold a meeting with her to discuss the contents of the new job description.

125.    Around the same time, UVA reaffirmed that it would not reassign Ackerson to a private office.

126.    Milton Adams retired in May 2016 from his position as Senior Vice Provost.

127.    After Adams' departure, UVA assigned Anda Webb ("Webb"), Vice Provost for Administration and Chief of Staff, to be Ackerson's direct supervisor.

128.    Ackerson eventually met with Webb on or about June 6, 2016 to discuss Ackerson's job description and Ackerson's duties in general.

129.    It was apparent from the meeting that Webb did not fully grasp either the extent of Ackerson's duties or the importance to UVA of the work that Ackerson did for UVA.

130.    Webb also told Ackerson during the meeting that Webb and Adams never discussed the scope of Ackerson's work prior to Adams' retirement.

131.    Later, in August 2016, UVA increased Ackerson's salary to $110,000 per year.

132.    UVA did not provide Ackerson with any explanation for the increase to her salary.

133.    In or about mid-December 2016, UVA asked Ackerson to take on additional duties, including taking on the Legislative Liaison duties left vacant by the departure of David Wolcott.

134.    Around the same time, UVA offered to assign Ackerson to a semi-private office in Booker House, a different building on campus.  Since this did not solve Ackerson's issue with needing a private office, it was not an attractive or acceptable offer.

**O. UVA Continues to Pay Ackerson Significantly Less Than it Pays Male Employees Who Perform Substantially the Same Work Under Substantially the Same Conditions as Ackerson.**

135.    UVA currently pays Ackerson a salary of $110,000 per year.

136.    By contrast, about two months after it hired Ackerson, UVA hired Robert F. German ("German") as a Project Director to work on the other high presidential priority project Rivers mentioned to Ackerson in mid-2012 and paid him a starting salary of about $150,000.

137.    UVA currently pays German about $159,429 annually, though German took on a position in the University Library as Program Director for the Academic Preservation Trust in 2014.

138.    UVA pays Sean Jenkins ("Jenkins"), Senior Assistant to the President, a salary of about $159,000 per year.

139.    UVA pays Jonathan Bowen ("Bowen"), Senior Assistant to the President, a salary of about $157,000 per year.

140.    UVA pays Eduardo Lorente ("Lorente"), Associate Vice Provost for Budget and Financial Planning, a salary of roughly $126,100 per year.

141.    UVA paid David Wolcott ("Wolcott"), Associate Vice Provost for Academic Accreditation, a salary of roughly $113,600 per year before his departure.

15

142.     And UVA paid Mark Hampton ("Hampton"), former Associate Vice President for Budget and Financial Planning, a salary of about $185,000 for performing comparable work to Ackerson prior to his departure.

143.     German, Jenkins, Bowen, Lorente, Wolcott, and Hampton are all men.

**COUNT I**
**The Equal Pay Act of 1963 ("EPA")**
**29 U.S.C. § 206(d)**
**Unequal Pay – Willful**

144.     Ackerson incorporates and realleges the allegations in the foregoing paragraphs as though alleged fully herein.

145.     Ackerson is an "employee" as defined by 29 U.S.C. § 203(e)(2)(ii).

146.     Defendants are "employers" as defined by 29 U.S.C. § 203(d).

147.     Ackerson is a female.

148.     Ackerson's comparators Robert German, Sean Jenkins, Jonathan Bowen, Eduardo Lorente, David Wolcott, Charlie Feigenoff, and Mark Hampton are all male.

149.     Ackerson performs work that requires at least equal, if not more, skill, effort, and responsibility as those of her male colleagues.

150.     Ackerson works under similar conditions as her male colleagues.

151.     Ackerson's comparable male colleagues receive compensation in a range of $113,000 to $185,000.

152.     Ackerson performed many of the duties assigned to Adams, yet UVA has compensated and continues to compensate her at a significantly lower rate than Adams.

153.     UVA fails to compensate Ackerson comparable to employees who: are of the opposite sex, work in the same establishment as Ackerson, perform work equal or comparable to that of Ackerson, retain positions that require equal skill, effort and responsibility as Ackerson,

16

and perform their work under similar conditions as Ackerson.

154.    UVA's violation of the Equal Pay Act in regard to Ackerson was willful and reckless.

155.    UVA knowingly and willfully set Ackerson's pay at a level substantially below that of her male colleagues.

156.    UVA ignored Ackerson's repeated complaints about the disparity in her pay from 2013 through the present.

157.    After Ackerson complained formally through counsel in October 2015 about her unequal pay, UVA knowingly and willfully continued to pay Ackerson at a level substantially below that of her male colleagues who perform comparable work.

158.    As a direct and proximate cause of UVA's violations of the Equal Pay Act, Ackerson has suffered significant monetary damages.

**COUNT II**
**The Equal Pay Act of 1963 ("EPA")**
**29 U.S.C. § 215(a)(3)**
**Retaliation**

159.    Ackerson incorporates and realleges the allegations in the foregoing paragraphs as though alleged fully herein.

160.    Ackerson is an "employee" as defined by 29 U.S.C. § 203(e)(2)(ii).

161.    Defendants are "employers" as defined by 29 U.S.C. § 203(d).

162.    Ackerson engaged in protected activity under the Equal Pay Act in summer 2013 when she complained to Nancy Rivers, James Milton Adams, and John Simon about the disparity in her pay.

163.    Ackerson engaged in protected activity under the EPA in November 2013 when she complained to Rivers and Adams again about the disparity in her pay.

17

164.    Ackerson engaged in protected activity under the EPA in October 2014 when she sent a memorandum to Rivers and Adams challenging her pay classification and salary level.

165.    Ackerson engaged in protected activity under the EPA in November 2014 and December 2014, as well as February 2015, when she engaged in UVA's internal review process regarding her job classification.

166.    Ackerson engaged in protected activity under the EPA in February 2015 when she informed Adams that she intended to seek a meeting with President Sullivan and John Simon to address her classification and salary complaints and the inequity of her pay as compared to men at UVA.

167.    Ackerson engaged in protected activity under the EPA beginning in October 2015, when she formally complained of her unequal pay through counsel and demanded that UVA take steps to remedy her equal pay.

168.    UVA took an adverse employment action against Ackerson when it stripped Ackerson of her private office and printer in summer 2014 after she complained about the disparity in her pay.

169.    UVA, through Adams, took an adverse employment action against Ackerson in February 2015 when Adams refused to give Ackerson the new three-year contract and corresponding promotion and salary increase that had already been approved by President Sullivan.

170.    UVA, through Sullivan, Simon, and Rivers, knew that Ackerson had been approved for a new position and also knew that UVA, through the actions of Adams, never gave Ackerson this new position description.

171.    Despite this knowledge, none of these individuals took steps to rectify the fact

18

that Ackerson did not receive the new three-year contract, which had been approved.

172.　UVA, through Adams, took an adverse employment action against Ackerson when, in February 2015, Adams threatened Ackerson's job if she sought a meeting with President Sullivan and John Simon to address her complaints about her job classification and salary inequity.

173.　UVA, through Adams, took an adverse employment action against Ackerson when Adams failed to give Ackerson a new position description for which she had been approved.

174.　UVA took adverse employment actions against Ackerson when it reaffirmed its actions of unequal pay twice in 2016 when it raised Ackerson's salary to levels that were still substantially lower than her male colleagues and assigned her more duties.

175.　UVA took an adverse employment action against Ackerson when it reaffirmed in 2016 that it would not assign her to a private office.

176.　These actions served to deter Ackerson from seeking to fully redress her rights under the EPA.

177.　As a result of UVA's unlawful retaliation in violation of the Equal Pay Act, Ackerson has suffered damages.

### COUNT III
**Title IX of the Education Amendments of 1972 ("Title IX")**
**20 U.S.C. § 1681, et seq.**
**Unequal Pay and Disparate Treatment Based on Sex**

178.　Ackerson incorporates and realleges the allegations in the foregoing paragraphs as though alleged fully herein.

179.　UVA is an "educational institution" within the meaning of 20 U.S.C. § 1681(c) because it is a public university that receives financial assistance from the United States federal

government.

180. Ackerson is an employee of UVA and is a woman.

181. UVA willfully paid Ackerson a substantially lower salary than it paid her male colleagues who: performed substantially the same work, had the same level of responsibility and skill as Ackerson, and worked under substantially the same conditions.

182. UVA took this action against Ackerson based, in whole or in part, on her sex.

183. As a result of UVA's unlawful discrimination in violation of Title IX, Ackerson has suffered damages.

**COUNT IV**
**Title VII of the Civil Rights Act of 1964 ("Title VII")**
**42 U.S.C. § 2000e, et seq.**
**Discrimination Based on Sex**

184. Ackerson incorporates and realleges the allegations in the foregoing paragraphs as though alleged fully herein.

185. Ackerson is female.

186. Ackerson is an "employee" within the meaning of 42 U.S.C. § 2000e(f).

187. UVA is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

188. At all times relevant to this complaint, Ackerson was fully qualified for the position she held at UVA.

189. UVA discriminated against Ackerson based on her sex when it paid male employees significantly higher wages than Ackerson, and those male employees: performed substantially the same work as Ackerson, had essentially the same level of skill and responsibility as Ackerson, and worked under substantially the same conditions as Ackerson.

190. UVA took these actions against Ackerson based, in whole or in part, on her sex.

191. As a result of UVA's unlawful sex discrimination against Ackerson, Ackerson has

suffered damages.

**COUNT V**
**Rehabilitation Act**
**29 U.S.C. § 794, *et seq*.**
**Retaliation**

192.    Ackerson incorporates and realleges the allegations in the foregoing paragraphs as though alleged fully herein.

193.    Ackerson is an employee within the meaning of the Rehabilitation Act.

194.    UVA is an employer within the meaning of the Rehabilitation Act, 29 U.S.C. § 794(b)(2(A), because it is a public university which receives financial assistance from the United States federal government.

195.    Ackerson has or had a disability within the meaning of the Rehabilitation Act because her diagnosed chronic fatigue syndrome substantially impaired her ability to work, walk, and perform daily tasks.

196.    Ackerson engaged in protected activity under the Rehabilitation Act because she informed UVA that she suffered from chronic fatigue syndrome, informed UVA that she would need to use medical leave for chronic fatigue syndrome in 2014, and sought an accommodation to work an adjusted schedule after returning to from leave.

197.    UVA retaliated against Ackerson for engaging in protected activity under the Rehabilitation Act when it removed her private office and personal printer during her absence for her disability.

198.    UVA retaliated against Ackerson, through Adams, for engaging in protected activity under the Rehabilitation Act when, in February 2015, Adams refused to give Ackerson the new contract, thereby denying her a promotion or an increase in salary.

199.    UVA retaliated against Ackerson, through Adams, for engaging in protected

21

activity under the Rehabilitation Act, when on February 26, 2015, Adams issued Ackerson a downgraded performance rating of "highly effective" as compared to "exceptional."

200.    UVA retaliated against Ackerson, through Adams, for engaging in protected activity under the Rehabilitation Act when, on April 14, 2015, Adams refused to provide Ackerson with a legitimate explanation for her downgraded performance evaluation rating of "highly effective" as compared to "exceptional."

201.    UVA retaliated against Ackerson when, on June 29, 2015, Linda Birckhead informed Ackerson that Ackerson would not be returned to a private office.

202.    UVA affirmed its conduct of denying Ackerson a return to a private office twice in 2016, both in March and December.

## Prayer for Relief

203.    For violations of the Equal Pay Act, 29 U.S.C. § 206(d), Ackerson demands such legal and equitable relief as provided by 29 U.S.C. § 216(b), including but not limited to the following:

        a.    Promotion;

        b.    Economic damages including front and back pay;

        c.    Liquidated damages;

        d.    Reasonable attorneys' fees and costs; and

        e.    Any other relief this Court may deem just and equitable.

204.    For violations of the Equal Pay Act, 29 U.S.C. § 215(a)(3), Ackerson demands such legal and equitable relief as provided by 29 U.S.C. § 216(b) which may effectuate the purposes of 29 U.S.C. § 215(a)(3), including but not limited to:

        a.  Promotion;

b. Economic damages, including front and back pay;

c. Liquidated damages;

d. Reasonable attorneys' fees and costs; and

e. Any other relief this Court may deem just and equitable to effectuate the purposes of 29 U.S.C. § 215(a)(3).

205.    For violations of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, *et seq.*, Ackerson demands such legal and equitable relief as this Court may deem just, including but not limited to:

a. Promotion;

b. Back pay;

c. Front pay;

d. Compensatory damages;

e. Punitive damages;

f. Reasonable attorneys' fees and costs; and

g. Any other relief the Court may deem just or equitable.

206.    For violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, Ackerson demands such legal and equitable relief as the Court may deem just, including but not limited to:

a. Promotion;

b. Front pay;

c. Back pay;

d. Compensatory damages;

e. Punitive damages;

f.   Reasonable attorneys' fees and costs; and

g.   And any other relief the Court may deem just or equitable.

207.   For violations of the Rehabilitation Act, 29 U.S.C. § 794, *et seq*., Ackerson demands such legal and equitable relief as the Court may deem just, including but not limited to:

a.   Assignment of a permanent private office;

b.   Front pay;

c.   Back pay;

d.   Compensatory damages;

e.   Punitive damages;

f.   Reasonable attorneys' fees and costs; and

g.   And any other relief the Court may deem just or equitable.

## **Jury Demand**

Plaintiff Betsy Ackerson demands a jury trial for all claims on which a jury trial is appropriate.

Betsy Ackerson
*By Counsel*

Adam Augustine Carter, VSB #32722
R. Scott Oswald, VSB #41770
The Employment Law Group, P.C.
888 17th Street, 9th Floor
Washington, D.C. 20006
Phone:  (202) 261-2803
Facsimile:  (202) 261-2835
acarter@employmentlawgroup.com
soswald@employmentlawgroup.com
*Counsel for Plaintiff*

24