CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

06/27/2018

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| BETSY ACKERSON, | CASE NO. 3:17-CV-00011 |
| *Plaintiff*, | |
| v. | MEMORANDUM OPINION |
| THE RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA, | JUDGE NORMAN K. MOON |
| *Defendant*. | |

The University of Virginia ("Defendant") hired Betsy Ackerson ("Plaintiff") in the fall of 2012 for a one-year term. Plaintiff was tasked with working on a strategic plan to support Defendant's future institutional growth. In the following years, her contract was extended as the development and implementation of the plan continued. However, in 2017, as Defendant's then-serving President planned to step down and the plan wrapped up, Defendant decided not renew its contract with Plaintiff.

Plaintiff now alleges Defendant violated various federal statutes by paying her less than male employees and by retaliating against her for engaging in protected activity. Defendant denies it discriminated against her and maintains it did not renew Plaintiff's contract because there no longer was any need for her temporary position. Both parties have moved for summary judgment. (Dkts. 39, 47). Because a reasonable jury could find that Plaintiff has identified a male employee that performed work that was substantially equal to her work, but was paid more than her, her Equal Pay Act, Title VII, and Title IX claims survive. But because, among other reasons, a reasonable jury would be required to find that Defendant's failure to renew Plaintiff's position was based on legitimate and non-discriminatory reasons, Defendant is entitled to

summary judgment on the retaliation claims. Plaintiff's cross-motion addressing Defendant's affirmative defenses will be denied without prejudice.

## I. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When considering cross-motions for summary judgment, the court must "consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Defs. of Wildlife v. N.C. DOT*, 762 F.3d 374, 392 (4th Cir. 2014).

## II. Factual Background

### A. President Sullivan's Plan

In the fall of 2012, Defendant's President, Teresa Sullivan, developed a new strategic plan for Defendant's future, called the Cornerstone Plan. (Dkt. 48-2 at ECF 11). The plan was to span several years and require investment of substantial institutional resources. *Id.* After the President's announcement of the plan, John Simon, the Executive Vice President and Provost, tapped J. Milton Adams, a senior administrator, to lead the plan. (Dkt. 48-8 at ECF 2). Adams became the Senior Vice Provost with the principal responsibility for the strategic implementation of the plan. (*Id.*).

Adams requested that a Project Manager be assigned to help him with management of the plan's development and implementation. (Dkt. 48-4 at ECF 10). A "Project Manager for

Strategic Planning" position was approved and advertised publically. (Dkt. 48-1 at ECF 127). It provided a salary range of $60,000 to $70,000, with a one-year term. *Id.* The position required at least a Master's degree, preferred a Doctorate, and required experience in higher education. The job description included the following responsibilities: supporting the Senior Vice Provost; managing an effective strategic planning process; collecting reports and data; managing information flow regarding the plan; designing a communication plan to facilitate implementation; managing steering committees and other work groups; and assisting the work group chairs to interface with the financial team to produce cost estimates, among other things. (Dkt. 48-1 at ECF 127–28). The position did not require supervision of any other employees, but did require collaboration with other departments. (Dkt. 48-1 at ECF 127–28).

**B.      Plaintiff Hired as the "Project Manager for Strategic Planning"**

In November 2012, Plaintiff applied to the Project Manager position. Plaintiff earned a Ph.D. in Higher Education and an M.B.A. (Dkt. 48-2 at ECF 13–14). She also had several years of higher education experience. From 1995 to 1996, Plaintiff worked as an Admissions Counselor at Sweet Briar College, making around $20,000 a year. (Dkt. 48-2 at ECF 15; dkt. 48-11 at ECF 47). After several years in the private sector, she returned to higher education in 2002, working as a Senior Corporate Gifts Officer at the College of William and Mary. (*Id.* at ECF 14). While at William and Mary she made around $65,000 a year. (Dkt. 48-11 at ECF 48). She worked at William and Mary until she decided to attend to graduate school at the University of Virginia. While a Ph.D. student, Plaintiff worked as a Graduate Assistant and later as an Academic Affairs Associate for Defendant. (*Id.* at ECF 13). She received a stipend as a Graduate Assistant, and made around $35,000 a year as an Academic Affairs Associate. *Id.* After graduating, Plaintiff became the Co-Principal at a higher education start-up venture in Ireland,

self-funding her salary. *Id.*

After receiving her application, Defendant selected Plaintiff for an interview and subsequently offered her a one-year contract as Project Manager. (Dkt. 48-1 at ECF 17). She negotiated a starting salary of $70,000 and received a $1,000 signing bonus. (*Id.* at ECF 22–24).

The plan was officially approved by the Board of Visitors in 2013. (48-1 at ECF 42). At that point, Plaintiff's duties transitioned from development to implementation, with some new tasks including financial forecasting and modeling for the plan. (*Id.* at ECF 42–43).

## C.    Plaintiff Requests New Jobs

Six months into her first year, Plaintiff approached Simon and asked to work directly under him in the Provost's Office. (Dkt. 48-1 at ECF 58–61). Simon displayed interest and asked Plaintiff to provide him with a proposed job description, which she did. (*Id.* at ECF 60–61). Simon never extended an offer for this proposed position.  (*Id.*).  Then, as the end of her first contract neared, in November 2013, she also approached Adams and Nancy Rivers, the President's Chief of Staff and Associate Vice President for Administration, regarding a new job. (Dkt. 48-1 at ECF 73). She discussed the amount of work she had taken on and claimed her salary was not commensurate with her work. (*Id.* at ECF 74). Plaintiff specifically claims, although Defendant disputes, she told her superiors that her inequitable pay reflected gender discrimination. (Dkt. 53-3 at ECF 39). She proposed a higher salary, a new title, the creation of a "continuous planning" office, and the assignment of managerial responsibility. (Dkt. 48-8 at ECF 5). After the meeting, her term was renewed for another year in her then-existing position, and she was given a 10% salary increase, bringing her salary up to $79,310. *Id.* Her other proposals were denied.

## D.    Plaintiff's Medical Leave

Then, a month after the November 2013 meeting, Plaintiff took medical leave for Chronic Fatigue Syndrome. (Dkt. 48-1 at ECF 35). While she was out on medical leave, and due to "serious space issues" in the Provost's Office, the University reassigned her empty office to another employee who needed office space. (Dkt. 48-13 at ECF 12, 25). This was not unique; the lack of office space affected other employees as well. (*Id.* at ECF 11–12, 25–27).

Approximately six months later, in July 2014, Plaintiff returned to work by gradually increasing her hours. (Dkt. 48-1 at ECF 94–95). Because her office was now filled, she was assigned a cubicle. (Dkt. 48-13 at ECF 12). She was later offered another, more private, workspace, but she turned it down. (Dkt. 48-1 at ECF 103). Due to the move, Plaintiff at first lacked a personal printer because her old printer remained in her previous office space. (Dkt. 48-1 at ECF 96). However, she was able to obtain a personal printer from Defendant, which she used for the remainder of her employment. (*Id.* at ECF 97–98).

**E.     Turnover in the Administration Affects the Plan**

Defendant unveiled a new organizational structure the same month Plaintiff returned to work. (Dkt. 48-1 at ECF 110). Plaintiff felt her new classification undervalued her contributions. (*Id.* at ECF 139). In light of this organizational reworking, she sought a review of her position. (*Id.* at ECF 110). In a three page memorandum to Adams and Rivers, she contended that "there was a serious salary inequity issue, and explained that a gross inequity existed between the work I was doing and the salary I was receiving compared to comparable positions at U.Va." (*Id.* at ECF 138). She concluded her memo by saying:

> It is clear that my current salary is not in line with the level and scope of work for which I am held responsible and that for the past year I have been grossly undercompensated. For this reason, I request that a retroactive salary adjustment be made to correct this long-standing issue.

(Dkt. 48-1 at ECF 140). The memorandum did not reference her gender, although it did reference

previous discussions where Plaintiff had tied the "salary inequity issue" to her gender. (Dkt. 53-3 at ECF 64–65). A month after she sent the memorandum, a Human Resources Consultant, Angelee Godbold, met with her and conducted a "Position Review." (Dkt. 48-14 at ECF 5). This review, which lasted two-and-a-half hours, analyzed her job duties and responsibilities. (*Id.* at ECF 10). Plaintiff subsequently continued to discuss a proposed Assistant Vice Provost position and a proposed Office of Continuous Planning (which she hoped to lead) with her supervisor, Adams. (Dkt. 48-8 at ECF 6).

However, Simon, who was the Provost and Executive Vice President, and President Sullivan disagreed about whether an Office of Continuous Planning and associated administrative positions were even necessary. (Dkt. 48-3 at ECF 21; dkt. 48-8 at ECF 6–7; dkt. 48-9 at ECF 14–15; dkt. 53-3 at ECF 72). This high-level disagreement slowed down any potential for changes to Plaintiff's role. And then, in October 2014, Simon publicly announced that he would be leaving Defendant the following June. (Dkt. 48-8 at ECF 6). Simon's imminent departure created further "uncertainty" about how Defendant would engage in ongoing planning. (Dkt. 48-9 at ECF 14–16). In light of this uncertainty, neither Godbold nor Adams was able to offer any changes to Plaintiff's role. Accordingly, Plaintiff's project manager position was renewed again in late 2014, but no other changes were made to the position at that point. (*Id.* at 15–16).

Eventually Defendant's administration stabilized, and once it did, President Sullivan decided not to create an Office of Continuous Planning. (Dkt. 48-3 at ECF 21). Plaintiff nevertheless continued to have conversations with her superiors about her proposed job description. Adams informed her that no new position would be approved unless Simon, who was now only months away from leaving, came to an agreement with the President. (Dkt. 53-3 at

ECF 69). Plaintiff later followed up with Adams to see whether any such agreement ever occurred. (*Id.* at ECF 70). When Adams told her that he did not believe it had, Plaintiff responded that she was going move forward by herself to call a meeting with President Sullivan, Simon, Adams, and Rivers to get an answer to her request for a new position. *Id.* Adams became frustrated and told her that if she tried to schedule such a meeting, she "risk[ed] losing [her] job." (*Id.* at ECF 70). Adams also told Plaintiff not to talk to anyone else about her ongoing requests for a new position or her planned meeting with Defendant's senior administrators. (*Id.* at ECF 71). Based on Adams' demeanor and response, Plaintiff dropped the issue.

Notwithstanding this incident, several months later Plaintiff received a salary adjustment of 1%, which was followed shortly by a merit increase of 2.24%, raising her salary as Project Manager to over $81,000. (Dkt. 48-2 at ECF 4).

**F.      Plaintiff Promoted to "Assistant Vice Provost"**

In April 2016, with a new Provost in place, Plaintiff received a revised job description, a new title ("Assistant Vice Provost"), and an increased salary (from $81,000 to $95,000). (Dkt. 48-8 at ECF 8). Like her previous employment contracts, this new position remained temporary and ran through December 2017. (*Id.*). Adams had retired, and so Plaintiff now reported to Vice Provost Anda Webb. (Dkt. 48-8 at ECF 7). Plaintiff was still responsible for facilitating University planning and institutional effectiveness. (Dkt. 48-1 at ECF 144–45). Similar to Plaintiff's previous position, the new position did not involve teaching, nor did it require the supervision of any employees.[1]  Later that year, Plaintiff, as well as several other Associate Vice Provosts, received a pay increase. Her new salary was $110,000. (Dkt. 48-2 at ECF 5).

**G.      Plaintiff's EEOC Charge**

---

[1]      Plaintiff notes that she has served as a guest lecturer, both while working for Defendant and elsewhere. However, teaching has never been a part of Plaintiff's job description.

In June 2016, Plaintiff filed a Charge of Discrimination with the EEOC. (Dkt. 53-37 at ECF 2). She alleged she had been discriminated against based on her sex and disability (*i.e.*, Chronic Fatigue Syndrome). (*Id.* at ECF 16). She further alleged Defendant retaliated against her based on her complaints and medical leave. (*Id.*). She received her Notice of Right to Sue from the EEOC in January 2017, filing this suit less than a month later. (Dkt. 1).

## H.     Plaintiff's Position is not Renewed

Then, in June 2017, Defendant informed Plaintiff that her position would not be renewed at the end of her term. The letter, authored by Webb, stated:

> Per the letter to you of April 11, 2016 (a copy is attached), your limited-term appointment with the University is set to expire by its own terms on December 24, 2017. . . . [T]hat date is consistent with the continued and rapid completion of nearly all of your responsibilities. The few remaining tasks and obligations, such as serving as the Provost's representative on the update to the University's 6-year plan, should be wrapping up by the end of the calendar year. In light of the foregoing, this confirms that your current appointment with the University will end on December 24, 2017 and will not be renewed. I wish you every success in your future endeavors.

(Dkt. 48-1 at ECF 150). This letter provided Plaintiff with over six months notice that her position would not be renewed. Notwithstanding the fact that Plaintiff's position was not to be renewed, Plaintiff still received a 3% merit increase later that year, raising her salary to $113,300. (Dkt. 48-2 at ECF 5).

## III.   The Equal Pay Act Claim

Plaintiff claims she was paid less than her male counterparts for performing equal work. Her "unequal pay for equal work" claims arise under three different statutes. The Court addresses only the Equal Pay Act claim, leaving the closely related Title VII and Title IX claims for the next section. *See Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994) (comparing the framework of EPA and Title VII claims); *Preston v. Com. of Va. ex rel.*

*New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994) ("Title VII principles should be applied to Title IX actions, at least insofar as those actions raise employment discrimination claims.").

"A plaintiff establishes a *prima facie* case of discrimination under the EPA by demonstrating that (1) the defendant-employer paid different wages to an employee of the opposite sex (2) for equal work on jobs requiring equal skill, effort, and responsibility, which jobs (3) all are performed under similar working conditions." *EEOC v. Maryland Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018). To be clear, a plaintiff need not prove her employer acted with discriminatory intent. *Id.* "Once a plaintiff has made the required *prima facie* showing, under the EPA, the burden[] . . . shift[s] to the defendant-employer to show that the wage differential was justified by one of four affirmative defenses listed in the statute." *Id.* As relevant here, one of those affirmative defenses provides: "A persuasive demonstration that the wage differential was caused by 'any other factor other than sex,' if accepted by the jury, would allow the defendant to avoid liability." *Brinkley-Obu*, 36 F.3d at 344 (quoting 29 U.S.C. § 206(d)(1)(iv)). Defendants are "required to establish that the cited reason [*i.e.,* Section 206(d)(1)(iv)'s "other factor"] *in fact* motivated the employer's decision" to pay the plaintiff less than a male performing equal work. *Maryland Ins. Admin.*, 879 F.3d at 121 n.7 (emphasis in the original). This is a "heavy" burden. *Id.* at 120; *id.* at 121 ("[O]nce the plaintiff has established a *prima facie* case the employer will not prevail at the summary judgment stage unless the employer proves its affirmative defense so convincingly that a rational jury could not have reached a contrary conclusion.").

## A.     The *Prima Facie* Case

Here, Plaintiff can make out her *prima facie* case. Plaintiff offers eight different proposed comparators. A reasonable jury could find that at least one of them, Justin Thompson,

(1) received higher wages than Plaintiff, (2) "for equal work on jobs requiring equal skill, effort, and responsibility," (3) in a job that was "performed under similar working conditions." *Maryland Ins. Admin.*, 879 F.3d at 120; *see also Beck-Wilson v. Principi*, 441 F.3d 353, 363 (6th Cir. 2006) ("[W]hether two positions are substantially equal for EPA purposes is a question of fact for the jury.").

On the first prong, the parties agree Thompson initially made $95,000 as Assistant Provost for Academic Planning and Development. (Dkt. 53 at ECF 20; dkt. 58 at ECF 3). Plaintiff made between $70,000 and $81,000 while working from 2012 until April 2016 as Project Manager. (Dkt. 48-1 at ECF 22–24; dkt. 48-2 at ECF 4). The question, of course, is whether these two positions were "equal," which leads this inquiry to the second prong.

With respect to the second prong, Plaintiff must establish she and Thompson performed equal work on jobs requiring equal skill, effort, and responsibility. "Congress chose the word 'equal' over the word 'comparable' in order to show that the jobs involved should be virtually identical, that is . . . very much alike or closely related to each other." *Wheatley v. Wicomico Cty., Maryland*, 390 F.3d 328, 333 (4th Cir. 2004) (internal quotation marks and citations omitted). But this is not to say a plaintiff is required to "identify one specific individual who constitutes a perfect male comparator," but simply that a comparison to a male employee must be made "'factor by factor' and cannot be made to a hypothetical male with a composite average of a group's skill, effort, and responsibility." *Id.* at 334 (internal quotations and citations omitted). The "factor by factor" nature of the test requires the Court to work through the skill, effort, and responsibility of proposed comparators by "evaluat[ing] their actual job requirements and performance . . . ." *Gustin v. W. Virginia Univ.*, 63 F. App'x 695, 698 (4th Cir. 2003). "A

plaintiff may make her *prima facie* case by comparing her salary to that of her predecessor or successor." *Brinkley-Obu*, 36 F.3d at 343 (citing 29 C.F.R. § 1620.13(b)(2), (4), and (5)).

As Assistant Provost for Academic Planning and Development, Thompson was hired because the Commission on the Future of the University recommended the creation of a planning office. (Dkt. 53-30 at ECF 2 ("The Commission on the future of the University recommended the creation of a planning office. Hiring the Assistant Provost for Academic Planning and Development is the first action taken on commission recommendations.")). The Commission was the name for the strategic plan that immediately preceded President Sullivan's Cornerstone Plan. (Dkt. 53-1 at ECF 16; dkt. 53-2 at ECF 12). Thompson remained in this position from 2007 to 2011. (Dkt. 48-2 at ECF 8). Seventy percent of his effort was to be on planning, implementing, and assessing strategies for Defendant's growth, including direction in developing the institutional planning process. (Dkt. 53-30 at ECF 2; dkt. 48 at ECF 30–31). Twenty percent of his effort was focused on "Build[ing] a model of academic/development planning." (Dkt. 53-30 at ECF 3). This heading included some fundraising duties (*e.g.*, "Assist the [P]rovost in development activities related to major Office of the Provost funding priorities . . ."). (*Id.*). The remaining ten percent of Thompson's effort was to be focused on "Other duties as assigned, including teaching and research as appropriate." (*Id.*).[2]

A reasonable jury could find Plaintiff performed "substantially equal" work to Thompson. *Wheatley v. Wicomico Cty., Maryland*, 390 F.3d 328, 332 (4th Cir. 2004). Plaintiff's role was created in response to President Sullivan's Cornerstone Plan. (Dkt. 48-4 at ECF 10). She spent sixty percent of her time working with the plan's steering committee and

---

[2]     While Defendant makes much of this reference to teaching, it is entirely unclear how much (if any teaching) Thompson actually did. In any event, his job description set it out as less than ten percent of his job, and so it will not be determinative here.

work groups (*e.g.*, "Write and edit drafts of the plan for review" and "Manage information flow and communications among the committee and work groups") and another thirty percent on communicating the strategic plan (*e.g.*, "Maintain an open and transparent planning effort throughout the process by communicating via the strategic planning web site and producing regular reports to the University Community"). (Dkt. 53-21 at ECF 2–3). This planning including "assist[ing] in developing an ongoing process to develop, mature, and select new, emerging efforts, develop costs and funding sources . . ." (*Id.*). All of this work was for the plan. (*Id.*). As with Thompson, the remaining ten percent of her time was for "Other duties as assigned." (*Id.* at ECF 3). Of course, these were just the written requirements of her role; Plaintiff has maintained she was working well beyond those requirements. Specifically, Adams agreed Plaintiff led much of the day-to-day work on the strategic plan. (Dkt. 53-2 at ECF 9–11). Adams also drafted communications about the plan on behalf of President Sullivan. (*See, e.g., dkt.* 53-9 at ECF 3–4 ("[I]n July 2013, I drafted a letter to the Board of Visitors that would later be sent by Teresa Sullivan which provided updates on the Cornerstone Plan.")). While Plaintiff engaged in other tasks, this summarizes the core of her responsibilities.[3]

The equality of Plaintiff and Thompson's positions also must be evaluated through the lens of the three factors set out in prong two: skill, effort, and responsibility. "In considering the level of skill required, a court may consider factors such as experience, training, education, and ability." *Emswiler v. Great E. Resort Corp.*, 602 F. Supp. 2d 737, 745 (W.D. Va. 2009). The description for Plaintiff's position said a doctoral degree was preferred, a master's degree was

---

[3]    Defendant's arguments about the uniqueness of Plaintiff's position are overwrought. While no one else may have been performing it while she was, a reasonable jury could find her position was substantially equal to Thompson's, who functioned as something close to a predecessor. *C.f.* 29 C.F.R. § 1620.13(b)(2) ("[W]here an employee of one sex is hired or assigned to a particular job to replace an employee of the opposite sex but receives a lower rate of pay than the person replaced, a *prima facie* violation of the EPA exists.").

required, and "[c]onsiderable management experience leading a large organization or project [was also] desire." (Dkt. 53-21 at ECF 3). Compare that to Thompson's position, the description for which stated a master's degree was "required," but that a "[b]achelor's degree with significant relevant experience may be considered in lieu of a master's degree." (Dkt. 53-30 at ECF 4). Likewise, Plaintiff's description wanted "experience with supporting a large management project in a university successfully (3 or more years)" and "[k]nowledge of the best practices in planning in a higher education environment, particularly in a research university." (Dkt. 53-21 at ECF 3). Thompson's position description more generally asked for "3-5 years broad administrative experience in a higher education setting." (Dkt. 53-30 at ECF 4). A reasonable jury could find Plaintiff's job required equal, if not more, skill than Thompson's.

Another factor that is relevant here is the relative responsibility required to adequately perform the two positions. "Responsibility concerns the degree of accountability required in performing a job." *Emswiler*, 602 F. Supp. 2d at 745. Thompson reported directly to a Provost, who then reported to the President. (Dkt. 53-30 at ECF 4). He was thus two steps away from President Sullivan. Plaintiff reported to Adams, a Senior Vice Provost. (Dkt. 53-21 at ECF 3). With respect to the strategic plan, Adams was the only buffer between Plaintiff and President Sullivan (*i.e.*, there was no need to go through the Provost). (Dkt. 53-6 at ECF 5). Accordingly, Plaintiff met one-on-one with President Sullivan to discuss the progress of the plan multiple times. (Dkt. 53-2 at ECF 8). So, both Thompson and Plaintiff were insulated from the President by one layer. A reasonable jury could find they exerted equal amounts of responsibility.

The third of the factors, effort "refers to the physical or mental exertion necessary to the performance of a job." *Emswiler*, 602 F. Supp. 2d at 745. Here, there is no evidence

demonstrating any difference in the effort required by these two positions. In sum, a reasonable jury could find Thompson and Plaintiff performed equal work.

Defendant's remaining arguments to the contrary are unavailing. While Plaintiff was paid more than Thompson later in employment, this does not remedy the earlier pay differential. While Plaintiff and Defendant had different job titles, the Fourth Circuit has reminded district courts (albeit in an unpublished decision) that "job titles are not dispositive." *Gustin v. W. Virginia Univ.*, 63 F. App'x 695, 698 (4th Cir. 2003). The Executive Branch agrees. *See* 29 C.F.R. § 1620.13(e) ("Application of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance.").

The Court now returns to the third prong of Plaintiff's *prima facie* case: whether she and Thompson both worked in jobs that were "performed under similar working conditions." *Maryland Ins. Admin.*, 879 F.3d at 120. While this question is set out as an independent prong, the Fourth Circuit has frequently collapsed this analysis into the second prong. *See, e.g., Maryland Ins. Admin.*, 879 F.3d at 122 ("Instead, as we have explained, at this initial stage we ask only whether the claimants and the identified comparators worked jobs requiring 'equal skill, effort, and responsibility,' and whether each claimant was paid less than one or more comparators." (omitting independent analysis of this third prong)). As discussed above, Thompson and Plaintiff both interacted with the same individuals and both had one intermediary between themselves and the President. A reasonable jury could certainly find for Plaintiff on this prong, and on her *prima facie* case more broadly.

## B. Defendant's Affirmative Defense

"Because [Plaintiff] established a prima facie case of discrimination under the EPA, [Defendant] [is] not entitled to summary judgment unless a rational jury could not [reject]

[Defendant]'s proffered reasons for the wage disparities." *Maryland Ins. Admin.*, 879 F.3d at 122.  Here, Defendant argues under the catch-all affirmative defense that the wage differential was caused by a factor "other than sex."  29 U.S.C. § 206(d)(1)(iv)).  As stated above, this is a "heavy" burden.  *Maryland Ins. Admin.*, 879 F.3d at 120.

> Defendant largely recites ite's objections to the comparators, arguing:
>
> UVA paid the various alleged comparators more than it paid Plaintiff for reasons other than sex, including UVA's reasonable, good faith belief that the various comparators were performing jobs that involved different skills, efforts, and responsibilities than Ackerson performed, that the various comparators had more extensive relevant educational credentials and experience appropriate for their respective positions, and that the market warranted the salaries paid to the various comparators in accord with their respective responsibilities, educational achievements, skills, experience, and length of service.

(Dkt. 48 at ECF 45).  But as summarized above, at least with respect to Thompson, a reasonable jury could find that Plaintiff was performing equal work to a comparator.  And there is evidence in the record that Plaintiff persistently voiced frustration with this inequity, specifically attributing it to her gender multiple times.  (Dkt. 53-3 at ECF 39).  Simon also initiated a conversation with Plaintiff about the gender pay imbalance across Defendant's tenure track positions.  (*Id.* at ECF 34).  In response, Plaintiff specifically told him that her own salary demonstrated a similar problem.  (*Id.*).  Nevertheless, Defendant continued to pay her less than it paid Thompson had for substantially equal work.  While the potential differences in "qualifications, certifications, and employment history . . . *could* explain the wage disparity between the claimants and" Thompson, "the EPA requires that a factor other than sex *in fact* explains the salary disparity."  *Maryland Ins. Admin.*, 879 F.3d at 123.  In light of the evidence concerning Plaintiff and Thompson's respective roles and Defendant's knowledge of Plaintiff's complaints, a reasonable jury would not need to find for Defendant on this defense.

Accordingly, Defendants' motion for summary judgment will be denied on the Equal Pay Act claim. Finding Plaintiff has established a case based on the comparison to Thompson, the Court expresses no view on whether other proposed comparators satisfy the Equal Pay Act's rigorous standard.

### IV. The Title VII and Title IX Claims

Under Title VII and Title IX, "[t]he plaintiff may establish a *prima facie* case by demonstrating that she is female, *i.e.*, a member of a protected class, and that the job she occupied was similar to higher paying jobs occupied by males." *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994); *Preston v. Com. of Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994) ("Title VII principles should be applied to Title IX actions, at least insofar as those actions raise employment discrimination claims."). Compared to the Equal Pay Act, Title VII and IX have "a relaxed standard of similarity between male and female-occupied jobs . . . ." *Id.* at 343 (internal alterations and citations omitted). Put differently, if a plaintiff satisfies the Equal Pay Act's more rigorous standard, she will also satisfy the less onerous standards of Title VII and IX. Accordingly, because the Court finds that Plaintiff has demonstrated she occupied a job that was "substantially equal" to that held by Thompson, the Court necessarily also finds she occupied a job that was "similar" to that held by Thompson. She has sufficiently made out her Title VII *prima facie* case.[4]

Now, under Title VII and Title IX, "the burden shifts to the defendant to offer a legitimate reason for the apparent discrimination." *Brinkley-Obu*, 36 F.3d at 344. "In contrast

---

[4]     Defendant argues it could not have discriminated against Plaintiff because some of her supervisors were women. This argument fails because Plaintiff's complaints throughout have largely been directed at her immediate supervisor, Adams, a man, who was at least partially responsible for any continuing inequitable pay. (*See* dkt. 53-3 at ECF 33–36 (recounting conversation with Simon where he stated he was aware of gender pay disparity at the University generally, Plaintiff asked for an increase, and Simon told her it was Adams's "problem")).

[to the EPA], in a Title VII case, the employer need only proffer a legitimate, nondiscriminatory reason for the challenged action," *i.e.*, they *do not* need "to establish that the cited reason *in fact* motivated the employer's decision." *Maryland Ins. Admin.*, 879 F.3d at 121 n.7. So here, *contra* the previous paragraph, Defendant has a lower standard to meet than in the Equal Pay Act context. Defendant proffers the same legitimate, nondiscriminatory reason as above in the Equal Pay Act context. (*See* dkt. 58 at ECF 23 ("As noted with respect to Ackerson's EPA claim, UVA relied on factors other than sex in setting Ackerson's pay.")).

But, again, this proffered reason for the wage disparity is deeply underwhelming if there were in fact no factors that justified paying Thompson more than Plaintiff. And Anda Webb's affidavit, which Defendant cites for the supposed differences between Plaintiff's role and Thompson's role, is not to the contrary. It never addresses the difference between Thompson's $95,000 salary and Plaintiff's $70,000 starting salary, instead focusing only on Thompson's later $105,000 salary. (Dkt. 48-2 at ECF 8–9). It also cites one-off tasks that were part of Thompson's "other duties as assigned" (*e.g.*, helping develop a position for the Dean of the Batten School), instead of focusing on the seventy percent of his role that involved work on the previous strategic plan and was very similar to Plaintiff's work. (*Id.*). In light of the similarities between Thompson's role and Plaintiff's role (discussed above in the Equal Pay Act section), a reasonable jury could disagree about whether this proffered reason actually provided any reason for the pay differential. Simon's awareness of Plaintiff's concerns and subsequent inaction provide further evidence a reasonable jury could rely upon in finding for Plaintiff on this claim. (Dkt. 53-3 at ECF 33–36). Accordingly, the motion for summary judgment on these claims will also be denied.

## V.  Retaliation Claims Under the Equal Pay Act, Title VII, and the Rehabilitation Act

"Plaintiffs may prove [retaliatory discrimination claims] either through direct and indirect evidence of retaliatory animus, or through the burden-shifting framework of *McDonnell Douglas*."  *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).[5]  To proceed under *McDonnell Douglas*, a plaintiff must show three things: (1) that she engaged in protected activity; (2) that her employer took a materially adverse action against her; and (3) that a causal relationship existed between the protected activity and the adverse employment activity. *Id.* at 250. If Plaintiff can set out a *prima facie* case, the burden shifts to Defendant to show a legitimate, non-retaliatory reason for the adverse action. *Id.* If Defendant provides such a reason, the burden would shift back to Plaintiff to show that the reason was a pretext. *Id.*

Plaintiff alleges she engaged in three protected activities and Defendant responded with three retaliatory actions (although there is not necessarily a one-to-one relationship between the protected activities and the retaliatory actions).  The protected activities were: (1) Defendant's medical leave for her Chronic Fatigue Syndrome, (2) her complaints to Defendant about her inequitable pay, and (3) the filing of her EEOC charge and this lawsuit.  In response to the medical leave and her complaints about inequitable pay, Plaintiff alleges Defendant removed her private office and printer.  In response to the complaints about inequitable pay, Plaintiff alleges Defendant failed to confer pay raises and her desired title change.  In response to the complaints

---

[5]  Retaliatory discrimination claims under the Equal Pay Act, Title VII, and the Rehabilitation act all share the same framework. *See Reardon v. Herring*, 191 F. Supp. 3d 529, 549 (E.D. Va. 2016) (recognizing that the EPA, incorporated into the FLSA under 29 U.S.C. § 215(a)(3), requires the same *prima facie* elements as *McDonnell Douglas*); *Foster*, 787 F.3d at 249 (applying *McDonnell Douglas* in the Title VII context); *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012), *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015) (integrating the *McDonnell Douglas* framework to retaliatory claims under the Rehabilitation Act).

about inequitable pay and the filing of the EEOC charge and original complaint,[6] Plaintiff alleges her contract was not renewed. The Court works through each of these individually.

## A.     Private Office and Printer

Plaintiff contends Defendant retaliated against her for taking medical leave and complaining about her salary when it failed to provide her with a private office and a printer when she returned from medical leave in 2014. Materially adverse actions are those which "well might have dissuaded a reasonable worker from [engaging in protected activity.]" *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). What constitutes a materially adverse act of retaliation "will often depend upon the particular circumstances. Context matters." *Id*. at 69. This standard envisions that an "act that that would be immaterial in some situations is material in others." *Id*. at 69 (internal citations omitted). An action is not materially adverse if it amounts to "petty slights or minor annoyances that often take place at work and that all employees experience." *White*, 548 U.S. at 68.

Here, neither the move to the cubicle nor the loss of a personal printer count as materially adverse actions. With respect to the printer, Plaintiff was able to get another from Defendant's IT department. (Dkt. 48-1 at ECF 96–98). The Court is sympathetic to her claim that her Chronic Fatigue Syndrome made traveling to the other printer difficult, but a reasonable jury would necessarily find that the eventual printer from IT solved the problem. Plaintiff's complaint that this printer was on loan, and so not truly "hers," borders on the frivolous because she kept the printer for three years and is in any event certainly no more than a "minor annoyance." (Dkt. 53 at ECF 42).

---

[6]     Plaintiff amended her complaint after filing suit to add a retaliatory discrimination claim under Title VII (Dkt. 12).

With respect to the office, we must not forget that "context matters." *White*, 548 U.S. at 69. While it might be possible to imagine a hypothetical where an office transfer constituted an adverse action, there is nothing like that here. Instead, all the evidence demonstrates that multiple individuals were being moved between offices to deal with space issues; no one was attempting to punish Plaintiff for her illness. (Dkt. 48-13 at ECF 25). On these facts, the Court agrees with other lower courts that have found these "minor annoyances" do not constitute adverse employment actions. *See Shah v. Cty. of Los Angeles Dep't of Health Servs.*, No. CV 06-7446CAS (CWX), 2008 WL 2676533, at *12 n.20 (C.D. Cal. July 1, 2008) ("[T]he denial of one's private office, a phone, or computer does not constitute an adverse employment action as a matter of law.")*, aff'd sub nom. Shah v. Cty. of Los Angeles*, 399 F. App'x 305 (9th Cir. 2010)); *Mack v. S.C. Dep't of Transp.*, No. CA 3:12-2960-MGL-KDW, 2015 WL 1297836, at *18 (D.S.C. Jan. 28, 2015) ("DOT submits Plaintiff cannot establish a prima facie case of discrimination here because the move to a cubicle does not qualify as an 'adverse employment action.' The court agrees."), *report and recommendation adopted*, No. 3:12-CV-2960-MGL, 2015 WL 1297876 (D.S.C. Mar. 23, 2015).

And, even if one were to assume either of these deprivations was an adverse action, Defendant's "serious space issues" provide a legitimate nondiscriminatory reason for its actions. (Dkt. 48-13 at ECF 25). Given the amount of high level administrators who were employed, and the limited number of offices in which to house them, the University regularly relocated employees as staffing needs fluctuated. *Id.* Plaintiff responds that this reason was pretextual because she needed a private office to work on "sensitive" information. (Dkt. 53 at ECF 41). But President Sullivan noted Plaintiff "didn't deal with specific personnel or student records or anything like that," Plaintiff's work would have been subject to FOIA, and "[s]o in [Defendant's]

usual sense of what would be sensitive or confidential, this was not sensitive or confidential." (Dkt. 48-3 at ECF 17). A reasonable jury could not find these actions were retaliatory. This theory fails.

**B.    Salary and Position Change**

Second, Plaintiff argues that Defendant retaliated against her for making complaints about her salary and position when it failed to provide her with the increases in salary and a change in title when she requested them. (Dkt. 53 at ECF 43). With respect to the title, Plaintiff must show "(1) she is a member of a protected class; (2) her employer had an open position for which she applied or sought to apply; (3) she was qualified for the position; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959–60 (4th Cir. 1996). Here, though, the title and position Plaintiff wanted neither existed nor were open; she was asking for the creation of the Office of Continuing Planning and new positions in the Provost's office. (Dkt. 48-1 at ECF 58–61; dkt. 48-8 at ECF 5). These do not constitute the "open positions" that can support this sort of claim.

Plaintiff's conversation with Adams where he stated she risked losing her job if she unilaterally tried to schedule a meeting with President Sullivan concerned her desire for this new position. (Dkt. 53-3 at ECF 68–73). As just explained, because no open position existed, Plaintiff was not entitled to the creation of one, and so this incident cannot sustain this portion of her retaliation claim. This alleged threat was not acted upon, *see McNair v. D.C.*, 903 F. Supp. 2d 71, 75–76 (D.D.C. 2012) ("A long line of cases from this Circuit and others have held that threats, revoked disciplinary plans, and other such ultimately unconsummated actions are not materially adverse for purposes of retaliation claims."), and Plaintiff received a pay increase

months later and a promotion the next year. (Dkt. 48-2 at ECF 4; dkt. 48-8 at ECF 8). Throughout this time, Adams sought raises for Plaintiff, and was only rebuffed here because of President Sullivan's disagreement with Simon about whether it was necessary to create a long-term Office of Continuing Planning and the associated positions. (Dkt. 48-2 at ECF 4).[7] Even if Plaintiff could make out a *prima facie* case, this disagreement provides an obvious and legitimate reason the new position was not created. Plaintiff fails to respond to this legitimate reason for Defendant's actions.

This leaves the denial of a raise. An employer's denial of a raise can function as an adverse action in some circumstances. *See, e.g., Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("In the context of this case, a tangible employment action would have taken the form of a denial of a raise or a promotion."); *c.f. Harrison v. S.C. Dep't of Mental Health*, 641 F. App'x 202, 207 (4th Cir. 2015) ("[I]f [a defendant] deprived [plaintiffs] of a raise given to all other similarly situated employees, then that would be a 'materially adverse' employment action for purposes of Title VII's retaliation provision."). Here, however, the alleged denials of raises constitute a reframing of the very same inequitable pay that Plaintiff complained about it in her underlying claims. Plaintiff's evidence only goes to establish that any pay differential was due to

---

[7]     Plaintiff criticizes Webb's affidavit and deposition multiple times because she is an "interested party." But it is black letter law that Plaintiff needs to present evidence that contradicts Webb's testimony, or at least show specific inconsistencies in her testimony, in order to survive summary judgment. Plaintiff cannot merely posit that some hypothetical juror might find Webb's testimony unconvincing. *See, e.g., Pine Ridge Coal Co. v. Local 8377, United Mine Workers of Am.*, 187 F.3d 415, 421 (4th Cir. 1999) ("UMWA contends that summary judgment was not proper, *notwithstanding that it filed no evidence to contradict that of Pine Ridge*, because they were entitled to have a jury make reasonable inferences regarding their position on the calculation of Pine Ridge's damages. However, Rule 56(e) states that '[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'" (emphasis added)).

her gender, not her conduct in complaining about it. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) ("The substantive provision seeks to prevent injury to individuals based on who they are, *i.e.*, their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct."). While unequal pay based on Plaintiff's gender can support the underlying claims discussed above, it cannot, without more, also support a retaliation claim. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 189 (2005) ("[P]rotection from retaliation is separate from direct protection of the primary right and serves as a prophylactic measure to guard the primary right. . . . To describe retaliation as discrimination on the basis of sex is to conflate the enforcement mechanism with the right itself[.]"); *c.f. Floyd v. Lee*, 968 F. Supp. 2d 308, 334 (D.D.C. 2013) ("[I]f the denial of a request for accommodation could itself support a claim of retaliation based on the request, then every failure-to-accommodate claim would be doubled.").

These retaliation theories fail.

## C.    Non-Renewal of Employment

Lastly, Plaintiff contends that Defendant retaliated against her for filing the instant lawsuit by not renewing her position beyond December 2017. Assuming Plaintiff can make out her *prima facie* case, Defendant has demonstrated it had a legitimate reason for not renewing Plaintiff's position: her work with the Plan was ending. In the June 2017 letter that informed Plaintiff that her contract would not be renewed, Defendant stated:

> [Y]our limited-term appointment with the University is set to expire by its own terms on December 24, 2017. . . . [T]hat date is consistent with the continued and rapid completion of nearly all of your responsibilities. The few remaining tasks and obligations . . . should be wrapping up by the end of the calendar year. In light of the foregoing, this confirms that your current appointment with the University will end on December 24, 2017 and will not be renewed.

(Dkt. 48-1 ECF 150). The burden thus shifts to Plaintiff to show that this reasoning is pretextual.

Plaintiff's sole evidence of pretext is her speculation that the plan "*may* have been only it its fourth year" out of five, reasoning that this could not be the true reason if the plan actually continued on. (Dkt. 53 at ECF 45 (emphasis added)). But Plaintiff's allegation of pretext fails for several reasons. First, Plaintiff fails to cite sufficient evidence in support of her alleged theory of pretext. *See Guerrero v. Lynch*, 621 F. App'x 755, 757 (4th Cir. 2015) (finding plaintiff's evidence of pretext to be impermissible because it was "nothing more than" speculation). As Plaintiff recognized, the Plan did not have a particular time frame or limit. (Dkt. 53 at ECF 2). Moreover, when Plaintiff and Adams previously discussed creating a new "Assistant Vice Provost" position in December 2014, it was discussed as being a three year term ending in December 2017—when Plaintiff's position ultimately expired. (Dkt. 48-1 at ECF 115–16). This is entirely inconsistent with her speculation about a longer timeframe. Second, President Sullivan, the originator of the plan, was already planning to step down. (Dkt. 48 at ECF 3). Understandably, Defendant did not want to tie itself to a mast of Sullivan's creation when a new pilot was soon to come onboard. Third, an "Office of Continuous Planning," which would have ostensibly created an ongoing need for Plaintiff's position, was never created. (Dkt. 48-3 at ECF 21). Without this office, it is unclear where Plaintiff would have fit moving forward. Fourth, it is undisputed that Plaintiff's tasks and responsibilities regarding the plan were wrapping up. (Dkt. 48-1 at ECF 150). Defendant did not have a duty to create more work to keep Plaintiff employed.

In sum, Plaintiff's tasks were winding down, there was no office for her to manage, her term was expiring, and the President was leaving—the plan was at an end. A reasonable jury could not conclude Defendant's proffered reason for the non-renewal was pretextual.

## VI.  Defendant's Affirmative Defenses

### A.  Good Faith

Plaintiff moves for summary judgment on Defendant's good faith affirmative defense. "Under 29 U.S.C. § 260, an employer in violation of the Equal Pay Act will be liable for liquidated damages, equal to and in addition to compensatory damages, unless the employer demonstrates to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not violative of the Act." *Brinkley-Obu*, 36 F.3d at 357.  "[T]he district court has the discretion to decline to award liquidated damages when good faith is established." *Id.*

Even though a jury could find for Plaintiff on the unequal pay claims discussed above, a reasonable factfinder would not be required to find Defendant acted willfully.  There is certainly evidence in the record that cuts in Defendant's favor: it repeatedly gave Plaintiff raises, it gave her a new position, and Defendant contends that many of Plaintiff's complaints about inequitable pay were unconnected to her gender.  The parties agree, for example, that Plaintiff's memorandum to Adams and Rivers did not explicitly mention gender (dkt. 48-1 at ECF 140), although Plaintiff argues it was inextricably tied to her gender.  (Dkt. 53-3 at ECF 64–65).  Different reasonable factfinders could disagree on these sorts of questions, which certainly are relevant to whether Defendant acted in good faith.  Summary judgment on this issue will be denied without prejudice.

### B.  Mitigation

Plaintiff sought back pay and front pay, both of which are subject to a duty to mitigate. *Crump v. United States Dep't of Navy*, 205 F. Supp. 3d 730, 744–48 (E.D. Va. 2016).  Defendant moves for summary judgment on Plaintiff's mitigation affirmative defense.  However, because,

as discussed above, no reasonable jury could find the non-renewal of Plaintiff's contract was unjustified, she will not be entitled to pay after the date her contract ended. And because Plaintiff remained employed by Defendant up until that date, she had no duty to go elsewhere to mitigate any effect of the allegedly discriminatory wages she received.

Accordingly, the mitigation issue is now moot.

**C.  Withdrawn Defenses**

Defendant voluntarily withdrew its Equal Pay Act affirmative defenses, other than the "other than sex" defense addressed above. (Dkt. 48 at ECF 58). Defendant also voluntarily withdrew its after-acquired evidence defense. (*Id.*). These parts of Plaintiff's motion are denied as moot.

## VII.  Conclusion

Plaintiff's claims will be pared down, but her case will proceed. A reasonable jury could find that Thompson performed substantially equally work to Plaintiff, but was paid more. But Plaintiff's retaliation claims fail. Some of the alleged acts of retaliation simply do not rise to the level of adverse employment actions. With respect to others, Plaintiff has failed to demonstrate Defendant's nondiscriminatory reasons for its actions were pretextual. Accordingly, Defendant's motion for summary judgment will be granted only in part. Finally, Plaintiff's cross-motion addressing Defendant's affirmative defenses will denied without prejudice.

The Clerk of the Court is directed to send a certified copy of this memorandum opinion and accompanying Order to all counsel of record.

Entered this __27th__ day of June, 2018.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE